May it please the Court, my name is Richard Mandel and I represent the appellant Ferrari S.P.A. This is an appeal from an order by District Judge Weill that denied Ferrari's motion to enforce a settlement agreement. There's no dispute in the case that the District Court will team the jurisdiction to enforce that settlement agreement pursuant to the terms of the stipulation and order resolving an earlier trademark infringement action that had been brought by Ferrari against Exoto. There's also no dispute that Exoto sold and used the Ferrari trademark in connection with the sale of miniature replica cars after the expiration of the sell-off period in the settlement agreement in violation of the plain language of the settlement agreement. Nevertheless, the District Court refused to enforce the settlement agreement holding that Ferrari was required to bring a separate action in which certain factual issues that had been raised by Exoto could be fleshed out. And we respectfully submit that in so doing, the District Court abused its discretion because the facts to which the District Court referred were not in serious dispute and that if the Court had actually looked at them What do you want us to do? We believe that the Court should remand with an order that the District Court proceed to enforce the settlement agreement under appropriate injunctive relief and order an accounting of profits made by Exoto from a sale. Doesn't there have to be Why don't you send this back to what judge? It's in front of Judge Weill. Yeah, okay. That's what you want. Doesn't he have to do an evidentiary hearing? Excuse me, Your Honor? Doesn't he have to do an evidentiary hearing as to whether or not there's in fact a breach? I don't think so. I mean, as I was saying, there's no dispute that the settlement agreement itself, that there were actions taken after that violated the settlement agreement. The only question You mean the appellees agree they violated the settlement agreement? I think the appellees agree that they sold and used the Ferrari trademark subsequent to the expiration period of the sell-off period. They don't dispute that. They dispute whether they were entitled to do that by virtue of various negotiations that took place between First Ferrari and its Right. Doesn't that have to be determined? Well, we don't think it does because we think that if you all the facts that were necessary were in front of the district court and we think that those facts established as a matter of law that there was never any binding agreement made between Ferrari and Exoto subsequent to the settlement agreement. That basically all you have are negotiations. And if you actually look pretty carefully at what Exoto says Nothing was signed. There is a document that there was one agreement that was signed by only Exoto that was never signed by Ferrari. You don't have anything signed by both parties. No. And I think What do you think the damages are here? Well, I think we would need to know the profits that were derived from the sale of these cars that were basically made without ever paying anything to Ferrari. I mean, the interesting thing about If I pay, what, 6% of what? Well, that would have to be determined. I guess what the 6% growth of what? I think we would be entitled to the profits that are attributable to the violation. I mean, I agree that we would need I mean, net or gross? Well, it would be net profits. And I think the district court would have to determine whether beyond just costs, whether they were entitled to deduct items like overhead. Say that again. I think the question of whether they would be entitled to deduct items like overhead would have to be evaluated. But obviously, profits, meaning gross profits, the revenue is less the costs we think we would be entitled to, and it would be that burden to establish if there was anything more than that in terms of costs. So you're Well, what was your deal? 6% of the profits? We had a 6% deal, I believe it was, under a royalty arrangement under the old settlement agreement. Yeah. But the point is that that was violated and there was no right to sell. I know. I'm just trying to figure out what's involved here. Right. I mean, I think the real issue for this Court to address at this point is whether factual disputes in terms of the negotiating history that followed that settlement agreement such that Ferrari was not How much did each one of these sell for? I think they vary. I'm not sure of what Exodo actually currently sells for. I think it may be hundreds of dollars. Counsel, I think, for a defendant Hundreds of dollars apiece. Some of these items, yeah. They have defenses, too, right? Latches and estoppel. They did. The district court didn't accept the latches defense. In fact, there was a proposed order that was presented that was based on latches that he specifically refused to sign. And I think that the record is We don't know what that means. We can't tell what that means. Are you sure you want this to go back to Judge Real? Well, we do think that this Court has enough information right now to basically enter an appropriate Yeah. Injunction. Do you think there's any purpose in your going to mediation? I never say no to mediation. I mean, I think No, I'm asking whether you really think there's any possibility that you two could settle it. It's hard to say. I mean, we really haven't gotten very far over the past several months in terms of having any meaningful discussions to be candid. So Does that mean you haven't had the discussions or they haven't been meaningful? We haven't really had the discussions. We made a proposal sometime back in the spring that was never responded to, and there's been no real discussion since then. So there is pending a State court action in which Xodo has sued us and in which at some point if it proceeds, there will be a mediation. Who's suing you? They've sued us in a separate State court action for breach of contract, and that's currently pending. A breach of the contract that allegedly was agreed to, which was under negotiation. Exactly. But I do want to talk. I don't want to lose sight of it, because the real question is, you know, did all of these negotiations plausibly result in some conceivable contractual relationship? And I think if you actually look at the facts, which the district court didn't really consider or address in its order or in its opinion on the record, I think the clearest proof that there was no binding agreement can be found in the fact that no royalties were ever paid. I mean, what could be clearer evidence? The fact of the matter is that. Well, we're not going to resolve that question. No, but you don't have to. But it's undisputed that they never paid royalties. And what I'm saying is that they're saying there's a binding agreement. They point to one document, then they point to a later document. Now, frankly, the existence of the later document is itself proof that the first document couldn't have been a binding contract, because why would you. I presume there is a dispute over that. Well, that's the issue. But I think the proof. That's what issue? You mean to say if there is a dispute? I think the issue is was there a reasonable disputed factual issue as to whether a binding contract was formed. And if there was, if there was, then what? Then I would concede that we would have to pursue that through a full litigation as the order allowed us to do. Then you can't enforce your settlement agreement? We could sue for breach of the settlement agreement. Pardon me? We could sue for breach of that settlement agreement. Isn't that what you're trying to do below? Well, what we tried to do is we came in on it. To enforce it. To enforce it without a full-blown litigation and discovery and all that. But you say you can't, you agree that you can't enforce a settlement agreement if there's any dispute over it? I think that if there is a true disputed factual issue as to whether a subsequent contract was formed, I would concede that that would be something that would have to be resolved in a lawsuit. But I think the point I'm making is that. Why? Why? Well, I guess alternatively, you could hold an evidentiary hearing. I suppose the Court could have ordered an evidentiary hearing to resolve that also. You could have held it in half an hour. Well. I don't understand your point either, that if you have a settlement agreement and you're alleging there's a breach of it, and the agreement says it can be enforced, you're saying it can't be enforced. I'm not saying it can't be enforced. I'm saying typically you would sue for breach of contract. Here, because the Court retained jurisdiction specifically to enforce the settlement agreement in the prior litigation, we do have the ability to come in and enforce it. On appeal here, I'm saying that if the Court agrees with the district court that there were disputed factual issues, then the Court couldn't just give us a judgment and enforce the agreement. No, we can't enforce the agreement. We're not going to – at least I assume we're not going to enforce the agreement. All we're going to do, if you prevail, is send it back and have the district court do something about enforcing the agreement instead of just saying, well, what did he say, the motion to enforce is denied because you can file a new suit. Right. That's what he said. That is what he said. I think the point that we're making on appeal is if you actually look at the record, look at the documents, which I don't think the district court analyzed, but they're in the record and they're in front of this Court and this Court can see them. We can't make findings on appeal. We can't make factual determinations on appeal. Well, I think you can if there's no factual dispute. I mean, I think the question is, as a legal matter, could you have – Why don't we hear from the other side here? Because the longer you talk, the longer you might persuade us that Israel is right. If it pleases the Court, Your Honors, I handled the – Well, did your client sell these little toys? It is my understanding – Well, don't tell me it's your understanding, you know. Did they or didn't they? It is my understanding that they did, Your Honor. They sold them. They did. They sold limited numbers under the January 2004 and October 2005 agreements. We have in writing confirmation from Ferrari saying that we do have a deal. You have a what? A deal. So in other words, a licensed deal. A deal. A licensed agreement. Okay. So how many – did you pay them any royalties?  No, tell me. Did you pay any royalties? No, Your Honor. What happened – there's more to the story, Your Honor. No, I don't want to hear the whole story. I want to know why you didn't pay. I was explaining. Yeah. That in the middle there's an entity called Mattel. Ferrari issues a license to Exodo, my client, but says I would like you to resolve some issues with Mattel. So they said, okay, they sent us a fully drafted license agreement for Exodo to sign, which Exodo did in January 2004. Okay. Six months prior to that, Exodo was invited to Italy as a licensee. We participated in Italy with Ferrari as a licensee. January 2004, a final document called license agreement was issued to Exodo for the signature Exodo sign. Now, within that process, we were supposed to manufacture these collectible Ferrari models. Mattel comes in the picture and says, wait a second. We believe that Exodo owes us money of amount of $200,000. We are, Ferrari, your largest licensee. We want you not to deal with Exodo until we're paid. This is just about January 2004. So we were saying, what does Mattel have to do with this thing? Mattel has nothing to do with our relationship. So Ferrari emails us saying, well, to have a better relationship, we'd like you to resolve that. Go see Mattel, see how you can figure things out. So we're like, one has nothing to... Was Mattel making these toys? Mattel is a competitor to us, yes. They were making these Ferraris. They're making Ferraris. In fact, what happened was, in 2000, we ended up suing Mattel for Mattel's infringement of our trademark. What happened, we found that Mattel's products had our logos on them. So we sued them saying, what are you doing? Our logo. So what happened was they had taken one of our products, sent it to China, start manufacturing and selling our product with our logo on it, Your Honor. We caught them. So as the result of that lawsuit, they were supposed to issue us a sublicense agreement with Ferrari. Because then, back in 2001, Mattel, we believe, had the master license to issue Ferrari licenses. So as that part of that settlement, we tried to get a sublicense. Now... Did you get a sublicense? That's the whole dispute, too. Did you, yes or no? No, no. Okay. But Mattel claims to Ferrari, four years later, that yes, a light sublicense was issued and we owe them money. And we, then we showed Ferrari saying, look, here's a letter from Mattel's counsel saying, no license. How do they get to tell you that there is a license? Here's a letter from Mattel. Nevertheless, Ferrari says, well, I don't know. Here's your license, we got your signature, but we need to deal with Mattel. So we're saying, look, if Mattel has a dispute with us, Mattel can sue us in court. Mattel chose not to sue us because, clearly, there's a contradiction in their position. So, lo and behold, we're continuing to appease Ferrari by continuing to negotiate. And that negotiation continues. And, yes, in fact, there were some limited products manufactured and sold under the belief that there is a license agreement with Mattel. We didn't make up a license. They prepared the license. They produced the license. They delivered the license. We signed that license. There's an e-mail from Ferrari saying, we have a deal. So... Okay, Larry, let me ask you this. All these things you're talking about are defenses to the enforcement of the settlement agreement. Well, they filed a motion saying, Your Honor, back in 2000... Okay, okay. They said enforce the settlement agreement. You went to the district court and said, no, don't enforce it. We haven't violated it. We have all these defenses. And they had latches. They had promissory stop. They had all these defenses. And what the judge said was, why don't you take them in another lawsuit? Now, why, tell me why the judge shouldn't have resolved all these things to determine whether there was a violation of the settlement agreement? Really, Your Honor, two things happened at that hearing. One was issues about the substantive issues. Whether there was a breach. The judge entertained my argument. They really didn't argue at the oral argument. They really didn't say anything. And the record speaks for itself. Now, two things happened. One on the merits, the judge, I believe, commented that it appears that from within that 10 years, there are negotiations and potential contracts, as we allege. So, therefore, I'm not going to ignore all of that because they didn't mention any of that in their motion. Okay. So what? So then he says you could say there was no breach because of these things. So the judge told them that. Sue them. But why? Why? They came to say there's a breach. Why should they go sue them in another case? Well, another separate case, Your Honor, because you have latches, number one. We're talking about a settlement. He could have decided that. He could have said, yes, there's latches or notarism. Because if you order an injunction based on the 2000-year 1999 agreement, what happens in that sense, then you would have to ignore the January 04 agreement. Okay. So he could have decided whether you're right about the January 04 agreement, 2004, or whether you're wrong. Well, I appreciate that, Your Honor. The problem with that is it's not a quick hearing where you put people to understand, because you've got to do discovery for that case. So exactly that's what we did. We sued Ferrari on that agreement, saying that, yes, there was a deal. When you sue to enforce a settlement agreement, you can only enforce it if you all agree on the facts? No. We sued them based on the January 04. No. They sued to enforce the settlement agreement. They brought a motion. Yes. And you say you can't enforce a settlement agreement unless everybody agrees to everything. Well, because it's impossible to enforce it, Your Honor. And I'll tell you why. Because to enforce the 2000 agreement, you would have to ignore everything that happened in the middle, and you have to basically say to Exodo that all that negotiation and that agreement never existed, therefore you violated that. That's what they want. Well, what's the point of having a settlement agreement where the district court retains jurisdiction? Well, if nothing else. Over the case. Over the case, right? Absolutely. If nothing happens in the middle, there's no complications, there's no further agreements, I agree with you. Then you wouldn't have to sue to enforce it. Right. But when a lot of things happen, Your Honor, these other events supersede that initial agreement. Because parties agreed to something in 2000. I agree. It supersedes the agreement. The agreement's the agreement. It sounds like my cousin Vinnie. Well, let's do this scenario. I agree if there was no other agreements in the middle, you're absolutely correct. But it really does appear. I know. I'm absolutely correct. It does appear from this record that, I mean, based on this record, no other evidence, I could, if I were the trier of fact, I would say there was not an agreement. Because? Based on the document, mandatory evidence, there's no signed agreement, signed by both parties. There is an e-mail confirmation from Ferrari Law. And Ferrari issued a license agreement for our signature, and we did sign it. Well, Ferrari didn't sign it. They issued the, I understand, but they issued the document. But if there is, so what? It's an authenticated document. Either there is or there isn't. Either way, if there is an agreement, then you say, no, I'm not going to enforce the settlement agreement. If there isn't, you say, I am going to enforce it. They don't decline or they don't deny that there is an agreement. Now, you're trying to persuade me who's right. What I'm asking you is why can't the judge say either, yes, there's a breach of the settlement agreement, or there isn't, one way or the other? Well, that would call for an evidentiary hearing. Okay, so? To see if there was a valid license agreement issued. So what? So it would call for an evidentiary hearing. That's a possibility. Then I guess that was the judge's decision to whether to allow you to discover. Well, the judge might decide, I don't want to hear any case. He could say any criminal case. You know, this would call for a hearing. So I'm just going to say, no, you can't prosecute him. I mean, all we are asking you are is an opportunity to be heard over the existence of the January of 2004 and October 5 hearing. We could do it in that forum. We could do it in Superior Court. Personally, I was in forum shopping. All I did was I addressed the scenario that the so-called manufacturing of these products in 2004. The question is, do you know of any reason that they shouldn't be allowed to pursue their motion to enforce the settlement agreement? And you say, well, the only reason is it would call for a hearing. That's what often happens in the motions. Thank you, Your Honor. And I'm not opposing that. What I said to the Court, and this is the second issue that happened. Now, you asked the Court to resolve some of these cases. And the Court said no. This is what happened, Your Honor. They filed a motion. An attorney, just Al Robbins, signed the declaration, defective declaration with no personal knowledge. I wrote to counsel. I said, counsel, I know you're from New York. This declaration is defective. Would you please reconsider filing a motion? They said no. So we had to file our opposition with our papers. Then in response to the opposition, they did a reply with a bunch of evidence attached to it. And I argued that before the judge. I said, judge, that violates the rule, because now I can't respond to all these exhibits attached to the reply. They were supposed to attach this to the motion. They filed the motion in February. The hearing was in June. There was a four-month time they could have refiled it. And I addressed that to the Court. It's impossible to respond to the new exhibits attached to the reply. It was impossible. That's a possibility as to why the Court denied their motion as it was, because truly the record speaks for itself. First of all, it was not a sworn testimony by Al Robbins. And second of all, it didn't have all the exhibits and everything that came with the reply. Their motion really was in the reply, not within the motion. And there's a letter from me to them saying, counsel, would you want to refile this? This is really wrong. And I gave them that opportunity. I didn't even play tricky with it. But now you have everything, right? Now I have everything. And right now what we have, Your Honor, is an ongoing litigation over the existence or nonexistence of this variety license agreement in superior court, because after what happened, what we saw the judge saying, we had to ---- Well, maybe the judge could just take back the case and stay the proceedings until the superior court makes a determination. Absolutely. Maybe the judge can make a determination. And some court has to decide whether Exoda is correct or not. Whether the federal judge does it, state court does it. Frankly, I don't care. I can, as you said, I can present my case within two hours. I'm okay with that. Okay. But the question is, who wants to listen? Well, I guess now I understand why Judge Rield didn't dismiss it. You're very entertaining. Let me ask you, I mean, you're a practical man, right? How many Ferraris did your client have manufactured? My understanding is we owe roughly around $70,000 in royalties. What did you say? Around $70,000 on royalties of the products that we sold. That's what I believe we owe. So you owe them $70,000? About, yes. Yeah, but I asked you, how many did you sell? I don't know the numbers, Your Honor, but from what I asked. How much did each of them sell for? I think they sell about somewhere between $250 to $300 per unit, Your Honor. Per car? These are collectibles. And Exoda specializes in these collectibles. And, you know, Natal wants to get in and compete with us, and it's just been a battle over. Are they selling Ferraris? Right now, no. No. No. So you think your client owes them $70,000? And we're asking for enforcement of that January 04 contract, and we're saying we want the fruits of that contract as well. What are the fruits of that? At least $2 million in profits, Your Honor. Oh, you want the fruits? So they owe you $1.8 million. Easy. Okay, well. I mean, this is a very important market. That's why Natal hung wrestle us. And the sad thing, Your Honor, is we're saying to Ferrari, look, there's no dispute that you issued a license. They agree that they did. But what they're saying there was a condition to it, and the condition is pay up to Natal. And we're saying, how do you get involved? How do you even get involved between us and Natal? That was a separate lawsuit between us and Natal, not even over a Ferrari license. Totally independent. But then we're suing for antitrust. We're saying, Natal, you can't do that to us. You're interfering. If you have a cause of action, go ahead and sue Zotto. You can't just sit on Ferrari saying I'm your biggest client, force them to pay up or else, or I'll pull my account. That's what happened. And that's the evidence before the judge. I assume you don't think there's much chance of settling this case. There is, Your Honor. There is. There is a chance of settling. I think they're interested to settle. So is my client. I coach my client that a settlement is a win-win. So we are prepared to settle the case. And I believe from what I've gathered so far, they have an interest to settle too. It's just that. Maybe you'd like to go to mediation also. I think we're open to it. Frankly, I think we're both open to that. And just with respect to discovery and having to take their positions and so forth, the opportunity did not come. Now recently I just got a motion from them challenging the venue, challenging that their single venue should be Italy. So we're saying to the court, look, they sued us here. What do you got in mind as a settlement? I think if they. We'll go off the record. Sure. I think if they agree to issue a license similar to what they did, rather than writing us a fact check, we're saying, you know what, we can work together. Issue the license again. Don't tell us to deal with Mattel. We can deal with Mattel. If Mattel has a cause of action, Mattel can deal with it. Okay. Then what are you going to pay them? We'll pay them what we agreed on the January 2004 agreement or similar October 2005 agreement. There are two agreements in place. Okay. Well, I've told that to counsel. I said there's no. I'm not trying to get a $2 million check out of you. I'm trying to reason with you to if you guys are willing to reissue a license, we can make the money that we lost in the open market. But if you decline to do that, then I've got no choice but to demand it. Why would they want to do business with you? You know, Judge, we had nothing wrong with it. I mean, we had a good relationship with them. The only thing that they got concerned over is Mattel. And so we don't have beef with them. We had a good relationship. They invited us to Italy. June of 2003, we were invited as licensees. We were given tags. We had a great relationship. They gave you nice jackets and all that. I wasn't there, but in-house counsel was there. My point is we had no point of frustration. The only frustrating point was, why didn't you go please Mattel? And that's what it was. I mean, other ones have gone along just fine. Okay. All right. Can I have a paper, please? Sure. Sure. First of all, I just want to correct the deficiency in Mr. Robbins' declaration that he's talking about. It said I declared it a penalty of perjury. It didn't say that it's true and correct. So he resubmitted the declaration with those words and included the same exhibits. It didn't change anything substantively. And there's nothing in dispute. I mean, everybody knows what the facts are. The facts are that we negotiated for a long time. That's true. But it never culminated in an agreement. And the clearest proof of that is that he's standing here telling you they owe us some money. Well, there was money due on the signing of that agreement, $118,000. That was never paid. If these agreements existed, you would think that the one thing that would have happened is the money that was due upon the signing of the agreement would have been paid to us. It never was. And even the fact that he's talking about two agreements shows there's no agreements because the second agreement is what he's saying is a modification of the first with a different term. And that agreement was clearly never signed by either party. And the last document in the record that's there, if you look at page 202, is an email where we're still going back and forth in October 2005, two years later. And they're trying to get a payment that they would make to Mattel credited against their minimum royalty obligation. And Ferrari says, no, we're not going to do that. And that's the last of it. So there's just no way on this factual record that any contract was formed. I understand that there were a lot of negotiations and there's a lot of paper about negotiations. But the bottom line is none of that resulted in a binding agreement legally. And that's clear from the fact that they never even paid the royalties that would have been due, that they kept negotiating with us. There are three possible fora for this, to decide this. One is he's got a state court suit going, he says. Two, Judge Reel could consider the enforcement issue and make some decisions about it. Three, you could do what Judge Reel wanted you to do, go find another judge, file another suit. You have a choice among those three? Well, I have a fourth choice, but I know the court's. You have us decide it. Forget that one. I think on the record it's clear that there was no subsequent agreement. All the paper shows that there was no subsequent agreement. Let's assume that we decide we have better things to do than act like a district. Then we would suggest that it be remanded to a different district judge to hold an evidentiary hearing if he believes it's appropriate to resolve the issues as to whether there's a subsequent agreement. Because the problem with the lawsuit that they brought against us for breach of these nonexistent agreements is those agreements also had exclusive jurisdiction in the courts of Italy. So the fact of the matter is if they want to enforce that agreement, they have to go sue us in Italy. Now, we say that that agreement was never formed. It's not an agreement. It's clear. There's never a sign. No payment was made under it. You know, there is no agreement. But if you want to enforce it, you're bound by its terms. You can't pick and choose them. Then you're bound by the trusts that tell you that. Okay. All right. So your answer is, and you don't want to file another suit in district court? I don't think we should have to. I mean, I think we did bring on a motion. The evidence was there. I think the evidence really does speak for itself if the Court looks at it, that there is no way as a legal matter that any binding contract could have been formed, and that's clearly shown. Let me ask you one more time. Sure. Let's assume there are disputes. Okay. Does that mean you can't bring an enforcement action? You have to file another suit? Well, no. I mean, certainly the Court could remand it to have an evidentiary hearing with respect to any disputed factual issues brought on by our motion. I mean, that is a possibility as well. Okay. And so your choice would be to remand it to the district court for the enforcement hearing, and you'd prefer, if you have a choice, to have a different judge? Well, that would be my choice. The choices that you've given me, yes. Okay. But if you didn't get a different judge, you would have to go back for an enforcement hearing before Judge Reel. Correct. And that would be your next choice? I suppose so. Okay. And you don't think there's any point in going to mediation? I can certainly ask my client. We were the ones who were asking for mediation for months and months and never got a date or response. At a certain point, I think we just gave up and decided that they didn't seem interested in settlement, so we were just going to go forward with the litigation. So that's where we are on that. Thank you. Well, you can – whatever you want to do, it's up to you. Can I give you a proposed order that he can sign? Well, just speaking. All right. Go. Okay. We're done for the day. I enjoyed this, really. Okay. This would be a great story for a movie, I think.
judges: Pregerson, Reinhardt, Wardlaw